DICKSON, Justice,
dissenting.
The Court’s decision is predicated on its application of the insurance endorsement language adding coverage for “hired” (rented) vehicles but limiting the scope of those “insured” by the phrase “but only while the automobile is being used in the business of the Named Insured [the Indiana Youth Soccer Association (TYSA’) ].” Haag v. Castro, 959 N.E.2d 819 (Ind.2012) (emphasis added). I believe this insurance contract is ambiguous and thus should be construed to provide coverage under Indiana law.
It is a well settled rule that insurance contracts are, in the first instance, “subject to the same rules of interpretation as are other contracts.” Eli Lilly and Co. v. Home Ins. Co., 482 N.E.2d 467, 470 (Ind. 1985); see also Am. States Ins. Co. v. Kiger, 662 N.E.2d 945, 947 (Ind.1996) (“The interpretation of insurance policies is not a new task for this Court.”). Accordingly, when the language of an insurance policy is clear and unambiguous, it will be enforced according to its plain and ordinary meaning. Eli Lilly, 482 N.E.2d at 470. But “ ‘[wjhere there is ambiguity, insurance policies are to be construed strictly against the insurer’ and the policy language is viewed from the standpoint of the insured.” Bosecker v. Westfield Ins. Co., 724 N.E.2d 241, 244 (Ind.2000) (alteration in original) (quoting Kiger, 662 N.E.2d at 947). This is one of those “special rules of construction of insurance contracts ... developed due to the disparity in bargaining power between insurers and the insured! ].” Allstate Ins. Co. v. Boles, 481 N.E.2d 1096, 1101 (Ind.1985). This approach is longstanding,[1] and is “driven by the fact that the insurer drafts the policy and foists its terms upon the customer.” Kiger, 662 N.E.2d at 947. Thus, “if reasonable persons may honestly differ as to the meaning of the policy language,” that ambiguous language “should be construed to further the policy’s basic purpose of indemnity.” Eli Lilly, 482 N.E.2d at 470; see also Bosecker, 724 N.E .2d at 244 (“Ambiguities are construed strictly against the insurer to further the general purpose of the insurance contract to provide coverage.”).
*826 Considering the disputed policy language and giving its words “their plain, ordinary, and popularly accepted meanings,” USA Life One Ins. Co. of Ind. v. Nuckolls, 682 N.E.2d 534, 539 (Ind.1997), the insurance contract language appears ambiguous. The provision in dispute, an endorsement providing coverage for automobile use, states:
With respect to hired auto and employers non-ownership liability, the insured means the named insured, member associations and its clubs, leagues, teams, employees, volunteers, executive officers, directors, stockholders, therein, but only while the automobile is being used in the business of the Named Insured. Coverage is not provided on behalf of the parents, managers, coaches, umpires, officials, referees, of the insured or volunteers using any automobile (personally owned, leased, borrowed or employer furnished) in the transportation of youth or adult participants to and from athletic games or athletic events, including but not limited to practices, exhibitions, post season and scheduled events.
Appellants’ App’x at 101 (emphasis added). There is no dispute that the Carmel Commotion was a “team” from a “member association” riding in a “hired auto” at the time of the accident. The Court and the parties are then correct that the question turns on whether the “automobile [was] being used in the business of the [IYSA].” But I disagree with the Court’s narrow characterization of the “business” of the IYSA in light of the designated evidence.
The Court views the “business” of the IYSA as “(1) ‘promoting soccer; (2) ‘regulating’ competition, leagues, teams, and players ...; and (3) ‘conducting’ specific events,” but opines that the “IYSA is not in the business of ‘competing,’ ” and since the Carmel Commotion was in Colorado to compete it was “engaged in its own business, not that of the IYSA.” Haag, 959 N.E.2d at 824. But the IYSA’s Articles of Incorporation, designated to the trial court on summary judgment, paint a broader picture of the IYSA’s “business.” One of the purposes of the IYSA, explained by its Articles of Incorporation, is “To develop and encourage sportsmanship and playing proficiency by all players and persons involved in soccer in the State of Indiana.” Appellants’ App’x at 815. “[P]laying proficiency” in the game of soccer is not encompassed within “promoting,” “regulating,” or “conducting.” Proficiency is “Performing in a given art, skill, or branch of learning with expert correctness or facility.” American Heritage Dictionary 989 (2d college ed. 1982). Thus, one of the stated purposes of the IYSA evinces a goal of cultivating and strengthening adept performance on the field.[2] The vehicle for evaluating the success or failure of this goal is competing. This was precisely the purpose for the Carmel Commotion’s trip to Colorado, to demonstrate its playing proficiency in a tournament in which they could not compete without the blessing of the IYSA.
Additionally, “promoting soccer” embraces interstate travel to engage in competitive sport as an incentive to the youth of Indiana to participate in soccer under the IYSA. To the extent the Carmel Commotion achieved success in the Colorado tournament, the purposes of the IYSA would be further served. The publicity *827 associated with championship level play by an IYSA team, however minimal, surely “promotes” soccer. Thus, the Carmel Commotion’s participation in the Colorado tournament, as an IYSA team, served to “promote ... the game of soccer among Youth under 19 years of age residing within the State of Indiana.” Appellants’ App’x at 815.
The Carmel Commotion’s Colorado trip could thus be reasonably understood as being “in the business of’ the IYSA. Indiana law is clear: where an insurance policy conveys conflicting reasonable constructions, it should be construed against the insurer and in favor of coverage. Bosecker, 724 N.E.2d at 244; Kiger, 662 N.E.2d at 947; Eli Lilly, 482 N.E.2d at 470; see also Everett Cash Mut. Ins. Co. v. Taylor, 926 N.E.2d 1008, 1014 (Ind.2010) (“A reasonable construction that supports the policyholder’s position must be enforced as a matter of law.”).
The second sentence of the endorsement, purporting to severely limit the coverage provided by the first sentence, does not apply to the facts of this case. Responding to its apparent deceptive or illusory effect, the Court finds a narrow possibility of resulting coverage. Even if the second sentence is to be given effect, however, such effect must be constrained by the plain language of the sentence, as discussed above. The second sentence of the endorsement states that there is no coverage for “the transportation of youth or adult participants to and from athletic games or athletic events, including but not limited to practices, exhibitions, post season and scheduled events.” Appellants’ App’x at 101. This language, however, does not “clearly and unmistakably” exclude coverage in this case. See Taylor, 926 N.E.2d at 1012 (“Although insurers are free to limit coverage to the extent the limitations are consistent with public policy, the exclusionary clause must clearly and unmistakably bring within its scope the particular act or omission that will bring the exclusion into play.”). The policy does not define “athletic games or athletic events,” but certain specific examples are identified: “practices, exhibitions, post season and scheduled events.” The four examples provided all speak to transportation to and from the soccer field. The Carmel Commotion was not traveling to or from the soccer field at the time of the accident; they were traveling to a team-building activity away from the soccer field. They had finished their games for the day and returned to the hotel in the interim. ■ If such travel was to be excluded, it was the responsibility of the drafter, Virginia Surety, to “clearly and unmistakably” bring it within the scope of the exclusionary clause. They did not do so, and thus the policy should be construed to further its basic purpose of indemnity.
Furthermore, it appears that the Court’s narrow view of “the business of the IYSA” is somewhat contradicted by the Court’s characterization of the second sentence as a mere amplification of the first. Haag, 959 N.E.2d at 824. Reading both sentences of the endorsement together, if “the competition” was unambiguously not “in the business of’ the IYSA, then there would be no need for such “amplification,” and therefore no need to exclude from coverage “transportation ... to and from athletic games or athletic events.”
Because I find that, under the facts of this case, a reasonable construction of the hired auto endorsement supports coverage, which coverage is not diminished by the plain language of the second sentence of the provision, I would reverse the summary judgment entered in favor of the insurance company.

. See, e.g., Masonic Accident Ins. Co. v. Jackson, 200 Ind. 472, 481, 164 N.E. 628, 631 (1929) (“It is elementary in the construction of insurance policies that where insurance contracts are so drawn as to be ambiguous or require interpretation or are fairly susceptible of two different constructions so that reasonably intelligent men on reading them would honestly differ as to their meaning, the courts will adopt that construction most favorable to the insured.”); Rogers v. Phoenix Ins. Co., 121 Ind. 570, 577, 23 N.E. 498, 500 (1890) ("[Wjhen an insurance company tenders a policy to a party seeking to be insured, and uses in the policy ambiguous words, these words will be held to have the meaning most favorable to the insured, as the presumption is that on this construction he took the policy.”).

. Soccer is a team sport requiring well coordinated interaction between teammates in order to achieve playing proficiency. Team-building exercises, such as the one to which the Carmel Commotion was traveling at the time of the accident, are a common means of developing the trust and camaraderie necessary to achieving playing proficiency on the field.